**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | No. 10 CV 5268 |
| JUAN JOSE FERNANDEZ GARCIA and LUIS MARTIN CARO SANCHEZ, | ) ) ) ) | |
| Defendants. | ) ) | |

**MEMORANDUM OPINION AND ORDER**

MARVIN E. ASPEN, District Judge:

Presently before us is a motion for summary judgment in a case that involves allegations of insider trading based on the purchase and sale of Potash Corporation of Saskatchewan, Inc. ("Potash") call option contracts. The United States Securities and Exchange Commission ("SEC") originally brought this action against two defendants, Juan Jose Fernandez Garcia and Luis Martin Caro Sanchez. Defendant Garcia subsequently settled with the SEC and is no longer party to the action.

Sanchez is a 37-year old Spanish citizen residing in Madrid, Spain. (Def. 56.1 Stat. ¶ 14.) On August 12 and 13, 2010, Sanchez purchased relatively risky Potash call options. Potash, based in Saskatchewan, Canada, is the world's largest producer of potash and the second and third largest producer of nitrogen and phosphate, respectively—all of which are primary crop nutrients used to produce fertilizer. (Pl. 56.1 Stat. ¶ 5.) Potash trades on the New York

Stock Exchange ("NYSE") and the Toronto Stock Exchange; options on its stock are traded on

the Chicago Board Options Exchange ("CBOE") and other options exchanges.  (*Id*. ¶ 5.)

On August 17, 2010, Potash made a public announcement that it had received and

rejected an unsolicited proposal from BHP Billiton Plc ("BHP") to acquire Potash for $130 per

share, a premium of 16% over Potash's closing stock price on August 16.  (*Id*. ¶ 6.)  As a result,

the stock price of Potash increased roughly 27%, and Sanchez was able to sell his options for a

profit of $496,953.33, a return of 1,046%.  (*Id*. ¶¶ 7, 41; Compl. ¶ 13.)  The SEC claims that

Sanchez's suspicious trading, his implausible explanation, and his obstructive post-filing conduct

suffice to support a jury verdict in the SEC's favor.  (Resp. at 3.)  Sanchez, on the other hand, argues

that the SEC has not identified a connection between Sanchez and any insider but instead hangs its

hat on bare assertions about "suspicious" trades.  (Mem. at 1.)  Accordingly, Sanchez has moved for

summary judgment.  For the reasons set forth below, we grant the motion.

## II. BACKGROUND

Unless otherwise indicated, the facts described herein are undisputed and culled from the

parties' Local Rule 56.1 statements of fact and accompanying exhibits.

### A. Sanchez's Trading Background

Sanchez testified at his deposition that he started trading in stocks and options when he

was approximately 16 or 17 years old and has traded in equities on behalf of his family company

for years.  (Def. 56.1 Stat. Ex. F.)  His experience purportedly includes purchases in securities,

options, foreign exchange trade, contracts for differences, warrants, and exchange traded funds,

using a variety of trading strategies; many of these transactions were on behalf of his family

business.  (Pl. 56.1 Stat. ¶ 16; Def. 56.1 Stat. ¶ 16.)  Sanchez states that his primary job or

2

livelihood involves handling his personal investments in real estate and stock exchanges, that he has substantial personal assets and significant monthly cash flow, and that he has traded in sophisticated financial instruments with a significant amount of capital at stake. (Def. 56.1 Stat. ¶ 15.) These assertions are not directly supported by evidence before the court. It is undisputed, however, that Sanchez traded in the warrants of four Spanish-based entities in 2007. After letting more than 2,500,000 of those warrants expire worthless, Sanchez sustained losses aggregating 1,242,613 euros. (Pl. 56.1 Stat. Ex. C-1 at 98; *Id*. Ex. D ¶ 35; *Id*. Ex. D-21.)

Sanchez has maintained an Interactive Brokers ("IB") account since June 2008. (*Id*. Ex. A ¶¶ 8, 9; *Id*. Ex. A-1 at 1.) IB is a global market maker and broker specializing in offering routing of orders and executing and processing trading in a variety of financial instruments on 90 electronic exchanges and trading venues around the world. (Def. 56.1 Stat. ¶ 31.) In documents submitted when opening the account, Sanchez indicated that he had four years of stock experience and two years of experience in options, commodities, and foreign exchange trading. (Pl. 56.1 Stat. Ex. A-1 at 2–7.) He further indicated that he made more than 100 trades annually and had extensive experience in stocks, options, commodities, and foreign exchange. (*Id*.) Between January 1, 2010 and August 12, 2010, Sanchez used his IB account only to trade futures and foreign exchange products. (*Id*. Ex. D ¶ 29.)

Sanchez testified that he has always been interested in the fertilizer industry, but before the Potash purchase, he had never invested in fertilizer companies. (*Id*. Ex. B-1 at 2; *Id*. Ex. C-1 at 68–69.) Moreover, Sanchez never purchased Potash securities before or after the transaction in question and did not invest in other fertilizer companies after the Potash purchase. (*Id*. Ex. B-1 at 3; *Id*. Ex. C-1 at 68–69.)

3

### B. The Potash Trade

On August 11, 2010, Sanchez made a decision to buy Potash options. (Pl. 56.1 Stat. Ex. A-3; *Id.* Ex. B-1 at 3.) Sanchez did not, however, have authority to purchase options in his IB account and thus requested permission to do so on the same day. IB sent, and Sanchez received and returned, a risk disclosure form soon after. (*Id.* Ex. A ¶ 12(a); *Id.* Ex. A-1; *Id.* Ex. A-3 at 1–2.) The approval process took longer than Sanchez anticipated, and he contacted IB customer service. After being informed that approval might take up to 48 hours, he indicated that he would appreciate if the process would move as quickly as possible. (*Id.* Ex. A-3.) IB granted Sanchez permission to trade options on August 12, and Sanchez began placing orders for September 125 Potash Calls[1] less than ten minutes after trading opened for the day. (*Id.* Ex. A ¶ 12(d); *Id.* Ex. D ¶ 22; *Id.* Ex. D-16.)

On August 12 and 13, 2010, Sanchez purchased a total of 331 September 125 Potash Call options. Sanchez paid a total of $47,499 to purchase these calls. (*Id.* Ex. D ¶ 20; *Id.* Ex. D-15; Compl. ¶ 36.) Specifically, on August 12 Sanchez entered eight limit orders to buy 161 Potash

---

[1] As used in this opinion, "September 125 Potash Call" refers to a call option on Potash securities with a strike price of $125 and due to expire on September 18, 2010. An equity call option gives its buyer the right, but not the obligation, to purchase 100 shares of a company's underlying stock at a set price ("strike price") before a certain date ("expiration date"). The option has value until the expiration date regardless of whether the stock is above or below the strike price because the trader can sell the option position on the open market. However, if the trader does not exercise or sell the call option prior to the expiration date, the option becomes worthless and ceases to exist as a financial position. (Pl. 56.1 Stat. ¶ 11; Def.'s Resp. to Pl.'s 56.1 Stat. ¶ 11.) At any given time, a trader can purchase specific options with a variety of expiration months and strike prices; options set to expire at quarter ends (March, June, September, December) typically offer the highest trading volume. (Pl. 56.1 Stat. ¶ 13; Def.'s Resp. to Pl.'s 56.1 Stat. ¶13.) At the relevant time, Sanchez could also have purchased, and co-defendant Garcia did purchase, Potash call options with an expiration date of August 21, 2010. (*See Compl.* ¶ 26.)

calls; four of the eight orders were executed at the original bid price, the other four cleared only after Sanchez raised his bid price. (Pl. 56.1 Stat. ¶ 31.) The purchased contract prices ranged from $1.08 to $1.58 per contract while the underlying stock was trading between $106.56 and $112.88, or 9.70% to 14.75% below the $125 strike price. (*Id.* ¶ 29.) During the trading on August 12, Sanchez requested a transfer of roughly 25,000 euros from his Banco Pastor account to his IB account. (*Id.* ¶ 32.) IB credited the money to Sanchez's account on August 13 at 2:16 am. (*Id.*) On August 13, Sanchez purchased another 170 September 125 Potash Call options. The contract prices on these options ranged from $1.33 to $1.51, and Potash stock was trading 9.80% to 11.95% below the $125 strike price. (*Id.* ¶ 35.) All of the September 125 Potash Call options purchased by Sanchez were out-of-the-money.[2]

Before trading on the NYSE or CBOE opened on August 17, 2010, Potash announced that it had received and rejected an unsolicited proposal from BHP to acquire Potash for $130 per share, a premium of 16% over Potash's closing stock price on August 16. (*Id.* ¶ 6.) It also released a copy of a letter from BHP to Potash memorializing a meeting between the two companies' chief executive officers a week earlier about BHP's unsolicited bid. (*Id.* ¶ 6.) Potash stock quickly increased $30.96 per share, or 27.61%, over the closing price from the previous day, to open at $143.11. (*Id.* ¶ 7.) The shares closed on August 17 at $143.17. As a result, all of Sanchez's September 125 Potash Call options were in-the-money and in fact quite valuable. (*Id.* ¶ 39.) Sanchez sold his entire position of 331 Potash calls for $544,452.37 that day and made a profit of $496,953.33, equal to a return of 1,046%. (*Id.* ¶¶ 40, 41.)

---

[2] Calls are considered "out-of-the money" if they have a strike price above the price of the underlying stock. Calls are considered "in-the-money" when they have a strike price below the price of the underlying stock. (Pl. 56.1 Stat. ¶ 12.)

On August 18, 2010, Sanchez attempted to withdraw 412,000 euros from his IB account and transfer the funds to his Banco Pastor account in Madrid, Spain. (*Id.* ¶ 43.) Sanchez points out that the amount of money then in the IB account greatly exceeded his historical average balance for trading activity in that account. (Def.'s Resp. to Pl.'s 56.1 Stat. ¶ 43.) However, instead of transferring the money, IB temporarily froze his account, notifying Sanchez that it was "conducting a routine review related to recent trading activity in his IB account." (Pl. 56.1 Stat. ¶ 44.) IB compliance told Sanchez that it would contact him once review was complete; Sanchez nonetheless continued to make attempts to transfer the money. (*Id.*) Sanchez asserts that these subsequent attempts were undertaken at the direction of IB staff. (Def.'s Resp. to Pl.'s 56.1 Stat. ¶ 44.)

The parties dispute the relevance of historical Potash stock prices, but the facts indicate the following. On July 28, 2010, Potash stock closed at $97.71. By August 6, 2010 it had appreciated nearly 20% to a daily high of $116.49. The stock declined after August 6 to its close on August 10 at $111.76. The price fell further on August 11, 2010, closing at $108.20—this represented the largest down-day for Potash stock between July 29, 2010 and August 17, 2010, in terms of both absolute dollars and percentage loss. On August 12, 2010, the stock again opened lower, at $106.85, but climbed through the day to close at $112.04. (Pl. 56.1 Stat. Ex. D-1.)

During roughly the same time period, July 29, 2010 to August 17, 2010, the S&P 500 Index peaked on August 9, closing at a value of 1128. On August 10 and 11 the S&P index fell 0.62% and 2.85%, respectively. (*Id.* Ex. D-13.) In so doing, the index traded through and closed well below its 200-day exponential moving average. (*Id.* ¶ 9.) August 11 was the largest down

6

day for the S&P over this time period; it was also the most volatile trading session over the period. The S&P continued to decline on August 12 and 13, falling 0.46% each day. (*Id*. Ex. D-13.)

### C. Investigation

According to the IB Director of Compliance Operations, who flagged Sanchez's Potash trades, he instituted the hold in part because of the extremely large profits Sanchez incurred relative to the timing of Potash's public announcement. (*Id*. ¶ 45.) IB compliance then reviewed the trades and reported their finding to the SEC. (*Id*. ¶ 45.) The SEC immediately filed this action.

After Sanchez found out about the suit, he quickly went to Chicago and voluntarily met with representatives from the SEC and other federal agencies; the interview lasted there hours, and Sanchez did not bring legal counsel. (Def. 56.1 Stat. ¶ 4.) The SEC has since conducted an extensive investigation, including interviews and communications with domestic and international companies and government agencies. (*Id*. ¶ 3.) As part of the investigation, Sanchez has produced bank, telephone, and historical trading records, as well as a hard drive analysis. (Pl.'s Resp. to Def.'s 56.1 Stat. ¶ 5.) Sanchez sat for a full day deposition on July 1, 2011. (Def. 56.1 Stat. ¶ 6.)

The SEC admits that it has yet to learn of any source that could have provided Sanchez with non-public, material information regarding Potash. (Pl.'s Resp. to Def.'s 56.1 Stat. ¶ 22.) The SEC has not identified the specific information Sanchez purportedly received or from whom Sanchez could have obtained the information. (Def. 56.1 Stat. ¶¶ 22, 23; Pl.'s Resp. to Def.'s 56.1 Stat. ¶¶ 22, 23.) Because the SEC has not identified the source of the alleged inside

information, it has not presented evidence that the alleged source breached a fiduciary duty. (Def. 56.1 Stat. ¶ 25.) The following facts related to the trade were revealed through the investigation.

### I. Explanation for Sanchez's Potash Trade

Immediately after learning of this suit, Sanchez traveled from Spain to the federal courthouse in Chicago and voluntarily met with representatives of the SEC. (*Id.* ¶ 5.) Sanchez sat for a three hour interview on August 25, 2010 without an attorney. (Pl. 56.1 Stat. Ex. B-1.) The interview was conducted in Spanish and English; Sanchez spoke in both languages and an SEC representative acted as translator. (*Id.*) Sanchez stated that he had been tracking Potash for months prior to purchasing the call options. Specifically, he said that he researched its stock and option volume, observed its stock bid/ask spread, read company news, and analyzed its quarterly earnings and stock price; he also looked into the fertilizer industry generally. (*Id.* ¶ 47.) Sanchez brought to the interview various news articles and other research concerning Potash, including two Credit Suisse analyst reports dated May 20, 2010 and July 29, 2010. (*Id.* ¶ 48; *Id.* Ex. D-5; *Id.* Ex. D-6.) Some of these articles were published after he had started purchasing the call options. (*Id.* ¶ 48.) The SEC asserts that Sanchez claimed to have relied on these documents when he decided to trade. (*Id.*) However, in his deposition, Sanchez states that he did not rely on these documents prior to trading, but that he brought them to the interview as evidence that Potash stock was a good purchase. (Def.'s Resp. to Pl.'s 56.1 Stat. ¶ 48; Pl. 56.1 Stat. Ex. C-1 at 117–135.)

In his deposition, Sanchez identified factors that he relied on when making his decision to buy Potash calls. He testified that he looked generally at wheat prices, agricultural business,

and the energy sector before buying the Potash call. (Pl. 56.1 Stat. ¶ 47.) He also stated that in

March or April 2010 he heard rumors that BHP might be interested in purchasing Potash, but he

discounted this as a factor in his decision. (*Id.* ¶ 50.) Other factors he relied on included

technical signals, confirmation of the technical signals, and intuition. (*Id.*) The following

explanations purportedly further support Sanchez's conclusion that Potash had a significant

upside in the short term.

 Sanchez explained that he received his first technical signal to buy on August 2, 2010

when he observed a crossover signal in the exponential moving average for the price of Potash

stock. (*Id.* ¶ 51; *Id.* Ex. C-1 at 83–86.) The SEC asserts that Sanchez made no mention of this

signal during his August 25 interview, but Sanchez points out that the interview was conducted

without a certified, neutral translator and that no verbatim summary is available; in addition, he

argues that the notes of the meeting produced by the SEC demonstrate that he brought up similar

signals during the interview. (Def.'s Resp. to Pl.'s 56.1 Stat. ¶ 51.)

 Sanchez testified that he received his confirmation of the technical signal on August 10,

2010:

 Q: So why didn't you buy on August 2nd?
 A: Because technically it is not a good idea - it is not a good idea to purchase at the time of
  the first signal. It is recommended to wait for a confirmation of that signal, because
  normally there's many false signals of that type in the marketplace.
 Q: So when did you receive the confirmation in this case?
 A: The confirmation I received approximately on August 10th.
 Q: What form did the confirmation take?
 A: That confirmation I had because there was a consolidation of the impulse of the cross of
  mediums, average, and that consolidation is known as pull-back, and consists of a slight
  drop in the price after a push for a higher price. And there was a hole that was filled - a
  gap that was produced during the increase - the previous increase.

(Pl. 56.1 Stat. Ex. C-1.)  While the SEC again argues that Sanchez made no mention of this confirmation during the initial interview, Sanchez reiterates that the interview was conducted without a certified, neutral translator and that no verbatim summary is available.  (Def.'s Resp. to Pl.'s 56.1 Stat. ¶ 53.)

Finally, to make his decision, Sanchez explained that he relied also on his intuition. While admitting it is hard to explain intuition, Sanchez testified that he looked at the trading volume of the stock and the general marketplace.  (Pl. 56.1 Stat. ¶ 50.)  Specifically, Sanchez testified that after reviewing various market indexes he had the impression that the market would increase.  He explained that the indexes wouldn't confirm his intuition but would act as additional elements.  For example, he explained, "if a cross is produced, but the market is dropping quite a bit, it is not recommended - to take position is not recommended.  But if the market is peaceful, there's not bad news in the economic environment, you can say, Go ahead." (*Id.* Ex. C-1 at 94–95.)  The SEC points out, however, that both Potash stock and the S&P 500 were declining in volatile trading on August 11, 2010.  (*Id.* ¶ 54.)

In his deposition, Sanchez explained his choice to buy options, rather than the underlying security, as an attempt to increase the risk level of his overall portfolio.  (*Id.* Ex. C-1 at 83–86.) While, Sanchez explained that he did not consider the September 125 Potash Call options to contain a particularly high level of risk, he did understand that options are a risky investment and that an investor who trades in options has to be able to assume the loss of the investment.  (*Id.*) Sanchez maintains that he was unaware of BHP's offer at the time he traded Potash options. (Pl.'s Resp. to Def.'s 56.1 Stat. ¶ 20.)

### ii.  *Alleged Spoilation*

Sanchez owned two computers in August 2010: a laptop computer and a desktop computer. (Pl. 56.1 Stat. Ex. C-1 at 110.) The parties dispute whether Sanchez intentionally threw away the laptop to hide relevant information and whether he "scrubbed" his desktop computer to destroy or alter computer files. (*Id.* ¶ 1; Def.'s Resp. to Pl.'s 56.1 Stat. ¶ 1.)

According to his deposition, Sanchez did have a desktop and an old laptop in August 2010, but he did not frequently use the old laptop. (Pl. 56.1 Stat. Ex. C-1 at 111.) Sanchez did not recall whether he ever executed a stock transaction on the laptop, but said that it was very slow and that he threw it out in December 2010. (*Id.* Ex. C-1 at 112–14.) He further stated that he conducted all his research for and bought the Potash stock on the desktop computer. (*Id.* Ex. C-1 at 112.)

By a court order issued on August 20, 2010, Sanchez was directed to preserve all documents and information that "refer or relate to the allegations described in the Commission's Complaint," including any information related to IB. (*Id.* Ex. C-2 at 7.) On August 24, counsel for the SEC sent an email to Sanchez explaining that he had to preserve all relevant documents; the email ended with a general request to "preserve all of your computers that you have used since at least January 1, 2010." (*Id.* Ex. C-3.) The SEC sent a request for production of documents on August 26, 2010 that requested the production of "A copy of the hard drive for all computers used by you or on your behalf during the period January 1, 2008 to the present." (*Id.* Ex. C-4 at 4.) Additional emails were exchanged between counsel relating to actual production of the hard drives, (*Id.* Ex. C-5; *Id.* Ex. C-6; *Id.* Ex. C-7; *Id.* Ex. C-8) and a similar email was

sent to Sanchez directly on January 31, 2011.[3]  (*Id.* Ex. C-10.)  Sanchez contends that these

documents show that the SEC repeatedly narrowed and focused its inquiry upon Sanchez's

desktop, despite its admitted knowledge that Sanchez had multiple electronic devices.  (Def.'s

Res. to Pl's 56.1 Stat. ¶ 1.)  It is true that the correspondences starting on November 17, 2010

referred to the "hard drive" while prior letters referred to "hard drives."  (*Compare* Pl. 56.1 Stat.

Ex. C-6, Ex. C-7, Ex. C-8 *with* Pl. 56. Stat. Ex. C-3, Ex. C-4.)  However, an email sent on

January 31, 2011, citing the August 26, 2010 document request, again refers to "hard drives."

(Pl. 56.1 Stat. Ex. C-10.)  Sanchez further asserts that the hard drive that was produced during

discovery was from the computer that he used to purchase Potash options and to conduct all of

his research.  (Def.'s Resp. to Pl.'s 56.1 Stat. ¶ 1.)

There is an additional dispute related to Sanchez's iPhone.  (Pl. 56.1 Stat. ¶ 1.)  While the

SEC asserts that Sanchez did not provide a list of his contacts or access to his iPhone records,

Sanchez asserts, and the record shows, that Sanchez did not have his iPhone with him at the

deposition.  (*Id.* Ex. C-1 at 112–13.)  The parties do not point to any other discussion about the

phone or its contact list.

On May 17, 2011, Sanchez produced documents to the SEC from a computer hard drive

that was analyzed by FTI Consulting ("FTI") based on an agreed-upon protocol.  (*Id.* ¶ 2.)  The

analysis revealed that "the Windows operating system installed on the hard drive conducted disk

defragmentation at periodic intervals as a scheduled background task."  (*Id.* Ex. C-12 at 2.)  It

also revealed that Sanchez had a program called CCleaner on his computer, a free optimization

---

[3]  On December 16, 2010, Sanchez informed the SEC that he was seeking alternative
representation.  (Pl. 56.1 Stat. Ex. C-9.)  On January 31, the SEC was still waiting to be
contacted by his new counsel.  (*Id.* Ex. C-10.)

and cleaning software that is advertised as making a computer faster and more secure. The program had last run in January 2011. When installed in April 2010, the program was configured to delete temporary files, temporary internet files, and the recycle bin, and wipe free space. According to FTI, the program had recently deleted or wiped approximately 200 files—consisting of temporary files, files in the recycle bin, and temporary internet files. (*Id.*)

IB records and maintains information—including the IB account number, the user name, the Internet Provider ("IP") address, the Media Access Control ("MAC") address, and the time and date—whenever a user logs onto IB's Trader Workstation trading platform to access their account. (*Id.* ¶ 3.) The records show that between November 30, 2008 and August 24, 2010, thirteen different MAC addresses were associated with Sanchez's trading account.[4] (*Id.* ¶ 3.) The records also show that two different MAC addresses accessed the account between August 11, 2010 and August 24, 2010. Sanchez asserts that FTI consulting analyzed the only hard drive and computer he used for trading in Potash and that the other MAC address associated with the account during this period was not logged in during a time when trading activity took place. (Def.'s Resp. to Pl.'s 56.1 Stat. ¶ 3.)

### iii. *Former Co-Defendant Garcia's Potash Trades*

Garcia was the head of the European Equity Derivatives division at Banco Santander, an advisor to BHP in connection with its tender offer of Potash. (Def. 56.1 Stat. ¶ 29.) The SEC alleged that on August 12, 13, and 16, 2010, Garcia purchased 282 call options, for approximately $13,699. The vast majority of these calls were set to expire on August 21, 2010.

---

[4] Neither party explains what a MAC address is, although the SEC implies that every electronic device has a different MAC address.

(*Id.* ¶ 28.) After the announcement on August 17, Garcia sold his call options for a profit of approximately $576,000. (*Id.* ¶ 28.) Garcia eventually consented to a Final Judgment in this matter on May 3, 2011. The settlement included an injunction, an order to disgorge $576,032.99 in profits from his Potash trades, and a civil penalty of $50,000. (*Id.* ¶ 30.)

Both Sanchez and Garcia reside in Madrid, Spain and both utilized IB to execute their Potash trades. (*Id.* ¶ 31.) These are the only established connections between the two codefendants. In 2010, IB had approximately 158,000 institutional and individual brokerage customers. (Def. 56.1 Stat. ¶ 31.) And the population of Madrid is over 6 million. (Mem. at 8.) Sanchez testified that he does not know Garcia, and the SEC has not demonstrated any other connection between Sanchez and Garcia. (Def. 56.1 Stat. ¶ 32.) In fact, the SEC admits that it has no direct evidence of any connection between Sanchez and Garcia. (Pl.'s Resp. to Def.'s 56.1 Stat. ¶ 33.)

### D. Procedural History

The SEC filed a complaint and Emergency Motion for a Temporary Restraining Order on August 20, 2010. (Dkt. Nos. 1, 8, 10.) The complaint alleges that Sanchez engaged in "highly profitable and highly suspicious trading" by trading Potash Calls on material, non-public information about BHP's proposed acquisition of Potash. (Compl. ¶ 1; Def. 56.1 Stat. ¶ 21.) Sanchez denies all the allegations. (Answer ¶ 43; Def. 56.1 Stat. ¶ 21.) After an *ex parte* hearing, the district court originally granted the SEC's motion for a temporary restraining order to freeze assets on August 20, 2010. (Dkt. No. 10.) The restraining order was last extended on September 1, 2011 and is currently set to expire on February 16, 2012. (Dkt. No. 103.) Sanchez

14

filed the current motion for summary judgment soon after, on September 22, 2011. (Dkt. No. 105.)

## III. STANDARD OF REVIEW

Summary judgment is proper only when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue for trial exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986). This standard places the initial burden on the moving party to identify those portions of the record that "it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553 (1986) (internal quotations omitted). Once the moving party meets this burden of production, the nonmoving party "must go beyond the pleadings" and identify portions of the record demonstrating that a material fact is genuinely disputed. *Id.*; Fed. R. Civ. P. 56©. "This is true even where the evidence is likely to be within the possession of the defendant, as long as the plaintiff has had a full opportunity to conduct discovery." *Anderson*, 477 U.S. at 256, 106 S. Ct. at 2515. In deciding whether summary judgment is appropriate, we must accept the nonmoving party's evidence as true, and draw all reasonable inferences in that party's favor. *See id.*, 477 U.S. at 255, 106 S. Ct. at 2513.

## IV. DISCUSSION

The SEC has alleged that Sanchez traded in Potash securities in violation of Sections 10(b) and 14(e) of the Exchange Act. Section 10(b) of the Exchange Act makes it unlawful to "[t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe." 15 U.S.C. § 78j(b). Pursuant to its statutory authority, the SEC has promulgated Rule 10b-5, which provides:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
>
> > a. To employ any device, scheme, or artifice to defraud,
> >
> > * * *
> > c. To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,
>
> in connection with the purchase or sale of any security.

17. C.F.R.. § 240.10b-5. "Under the 'traditional' or 'classical theory' of insider trading liability, § 10(b) and Rule 10b-5 are violated when a corporate insider trades in the securities of his corporation on the basis of material, nonpublic information." *U.S. v. O'Hagan*, 521 U.S. 642, 651–52, 117 S. Ct. 2199, 2207 (1997). The misappropriation theory extends the reach of Rule 10b-5 to outsiders—those "who would not ordinarily be deemed fiduciaries of the corporate entities in whose stock they trade." *S.E.C. v. Cherif*, 933 F.2d 403, 409 (7th Cir. 1991). Thus to establish insider trading by an outsider, the SEC must prove, among other things, that an insider, tipper, possessed material nonpublic information, that the tipper gave this information to the outsider, tippee, and that the tippee traded based on this information. *See S.E.C. v. Maio*, 51 F.3d 623, 631 (7th Cir.1995) ("[A] person violates Rule 10b-5 by 'misappropriating and trading

16

upon material information entrusted to him by virtue of a fiduciary relationship.'"); *Cherif*, 933 F.2d at 409–10 (noting the misappropriation theory focuses "on whether the insider breached a fiduciary duty to any lawful possessor of material non-public information."). Similarly, § 14(e) of the Exchange Act prohibit "any fraudulent, deceptive, or manipulative acts or practices, in connection with any tender offer." 15 U.S.C. § 78(n)(e). "Fraudulent, deceptive, or manipulative acts or practices," as described by Rule 14e-3, include trading on material, nonpublic information related to a proposed tender offer, if the information is obtained from "(1) The offering person, (2) The issuer of the securities sought or to be sought by such tender offer, or (3) Any officer, director, partner or employee or any other person acting on behalf of the offering person or such issuer." 17 CFR § 240.14e-3. As the SEC must prove possession of material nonpublic information obtained from an insider under both rules, and the summary judgment motion in front of us is based on the purported lack of such proof, we address the two claims together.[5]

The SEC rests its case on two contentions: (1) the SEC can establish insider trading through purely circumstantial evidence, and (2) Sanchez's failure to produce all of his electronically stored information should prohibit summary judgment. More specifically, due to the lack of evidence connecting Sanchez to an insider, the SEC is asking us to do two seemingly unprecedented things. First, it wants us to rule that a jury could find Sanchez traded on insider information, even though the SEC has no indication that Sanchez knew an insider. Second, it wants us to impose an adverse inference against Sanchez because he trashed a computer, even

---

[5] The SEC must prove its case by a preponderance of the evidence. *See Rowe v. Maremont Corp.*, 850 F.2d. 1226, 1234 (7th Cir. 1988).

though the SEC has no indication that there was relevant information on the computer. The problem for the SEC is that it cannot point us to any case where a court allowed either of these requests to succeed. As discussed in detail below, Sanchez does not, and could not, refute that insider trading cases can be based on circumstantial evidence. Instead, Sanchez convincingly argues that the SEC has not produced enough circumstantial evidence to go to trial. In every tippee insider trading case cited by the SEC, the SEC established facts that showed contact between an identified insider and the alleged tippee. We agree that some connection to an insider is essential in an insider trading case, and in this case there is no such evidence. As such, to find for the SEC, a jury must assume that the missing electronic information would have established a relationship with an insider, and from that the jury would have to infer that Sanchez received material non-public information from this insider on which he eventually traded.[6]

As the inferences that can be drawn from the missing electronically stored information will dictate what evidence the SEC can rely on to prove its circumstantial case, we start by addressing the spoliation issue. We then discuss whether, based on the undisputed circumstantial evidence, and drawing all inferences in favor of the SEC, a reasonable jury could return a verdict for the SEC.

**A. Spoliation**

Spoliation occurs when a party destroys evidence relevant to an issue in the case. *Smith v. United States*, 293 F.3d 984, 988 (7th Cir. 2002). "The destruction of evidence presumption has two elements: (1) the totality of the circumstances must show that the destruction was in bad

---

[6] Or, as Sanchez's counsel prefers to put it: "if we had some eggs, we could have some ham and eggs, if we had some ham." (Def. Reply at 2.)

faith, and (2) if the first prong is met, then the court 'may infer from this state of mind that the contents of the evidence would be unfavorable to the party if introduced in court.'" *Mintel Intern. Group, Ltd. v. Neergheen*, No. 08-cv-3939, 2010 WL 145786 at *7 (N.D. Ill. Jan 12, 2010) (citing *S.C. Johnson & Son, Inc. v. Louisville & Nashville Railroad Co.*, 695 F.2d 253, 258 (7th Cir. 1983)). As such, "[a defendant's] destruction of or inability to produce a document, standing alone, does not warrant an inference that the document, if produced, would have contained information adverse to the [defendant's] case. *Park v. City of Chicago*, 297 F.3d 606, 615 (7th Cir. 2002) (citing *Rummery v. Ill. Bell Tel. Co.*, 250 F.3d 553, 558 (7th Cir. 2001)). The Seventh Circuit has equated "bad faith" to the destruction of documents "for the purpose of hiding adverse information." *Mathis v. John Morden Buick, Inc.*, 136 F.3d 1153, 1155 (7th Cir. 1998); *see also Faas v. Sears, Roebuck & Co.*, 532 F.3d 633, 644 (7th Cir. 2008). "Thus, the crucial element is not that evidence was destroyed but rather the reason for the destruction." *Park*, 297 F.3d at 615 (citing *S.C. Johnson & Son, Inc.*, 695 F.2d at 258).

The SEC asserts that "bad faith is established when a party destroys evidence after the opposing party in litigation has requested such evidence." (Resp. at 20 (citing *MacNeil Automotive Products Ltd. v. Cannon Automotive Ltd.*, No. 09-cv-139, 2010 WL 5904124, at *6 (N.D. Ill. Nov. 2, 2010); *Krumwiede v. Brighton Assoc., LLC*, No. 05-cv-3003, 2006 WL 1308629, at *8 (N.D. Ill. May 8, 2006).) However, the SEC's citation is not wholly accurate. In *MacNeil*, the court adopted a previous court's finding that it was bad faith to allow "specific relevant documents" to be destroyed. *MacNeil* 2010 WL 5904124, at *6 (finding bad faith when the employer told employees not to destroy emails regarding the plaintiff, but did not mention retaining emails regarding the employee accused of the sexual harassment). *Krumwiede*

19

similarly states: "Once a party is on notice that files or documents in their possession are relevant to pending litigation, the failure to prevent the destruction of relevant documents crosses the line between negligence and bad faith." *Krumwiede*, 2006 WL 1308629, at *8 (finding bad faith after defendant "continued to delete . . . files after being put on notice that the contents of the laptop computer were the subject of litigation" and noting that there was clear evidence that defendant deleted relevant documents). In both cases, the destroyed evidence was not just requested, it was clearly relevant to the litigation.

Here, however, the SEC has not produced any evidence such that we can infer that Sanchez's discarded laptop contained relevant information. The SEC instead relies on Sanchez's testimony that it "could be" that he used his laptop in 2010 and that Sanchez didn't remember whether he sent emails from that laptop. (Sur-Reply at 3.) Neither of these remarks gives rise to even a reasonable suspicion that relevant evidence was on the laptop. Further, IB's records showing that multiple computers logged into Sanchez's IB account is besides the point. As the SEC admits, "the fact and timing of Sanchez's trading in Potash is undisputed. What is hotly disputed is what Sanchez did before he started trading, in particular how he got his information about Potash." (*Id.* at 3.) Without evidence of relevant information, we have no reason to believe that the destruction was for the purpose of hiding adverse information.

Further, under the circumstances of this case, requiring evidence that the laptop likely contained relevant information does not create incentives for defendants to destroy evidence. The SEC's reliance on *N. Marrocco v. General Motors Corporation,* 966 F.2d 220, 223 (7th Cir. 1992)*,* is misplaced. The SEC specifically quotes the Seventh Circuit's affirmation of the dismissal: "We find it ironic that the plaintiffs also contend that GM has not adequately

explained what an intact bearing assembly would have shown, for it was the plaintiffs' own misconduct which prevented GM from acquiring that very information." *N. Marrocco*, 966 F.2d at 223. The Seventh Circuit explained that what the evidence would have shown was irrelevant, because "GM was denied the opportunity to find out." *Id.* Based on this, the SEC would like us to infer that the laptop contained relevant evidence by finding that Sanchez "engaged in spoliation precisely because the evidence was relevant." (Sur-Reply at 2.) Yet, there are two critical differences between *N. Marrocco* and this case. In *N. Marrocco*, plaintiffs brought a products liability action alleging that the rear axle of their GM car was defective. After plaintiffs' experts, during an *ex parte* inspection of the car, accidently deformed the axle and made any further investigation by GM virtually impossible, the court dismissed the entire action—there was no question that plaintiffs had ruined essential evidence. The trashed laptop, on the other hand, is at best tangentially relevant to the SEC's case, and there is no evidence that the computer contained relevant evidence. Further, the plaintiffs in *N. Marrocco* deformed physical evidence in a products liability case. Unlike deforming an axle that either was or was not defective—the primary evidence pointing either way being the axle itself—destroying a laptop can hardly be seen as depriving the opposing party of an opportunity to find a source of material, non-public information. It seems extremely unlikely that the only evidence of a relationship between Sanchez and an insider was contained on the trashed laptop. The SEC does not claim it was denied access to phone or email records. The SEC presumably followed other avenues to prove a relationship, and it doesn't explain what type of information might be found

21

on the laptop (and only on the laptop) that could prove a relationship between Sanchez and an insider.[7]

As the Seventh Circuit opined in *Rummery*, a party seeking to rely on destroyed evidence must provide more than mere speculation that the documents contained adverse information. 250 F.3d at 558. In this case, we agree that Sanchez should not have thrown out the laptop after the SEC had requested access to all his hard drives. However, in light of the lack of evidence that any relevant information was on the laptop, we cannot find that Sanchez acted in bad faith, and as such, it would not be appropriate to impose an adverse inference. *See Mintel Intern.,* 2010 WL 145786 at *8 ("No inference is appropriate because the evidence did not establish that it was more likely than not that any of Neergheen's actions were taken in bad faith."). Furthermore, the inference that the SEC asks us to draw—that the computer files would have proven a link between Sanchez and a Potash insider—would require additional speculation, going beyond that required to impose a simple inference that destroyed evidence would have been unfavorable. Considering the circumstances surrounding the laptop, this is simply to great a speculative leap, and we decline to draw such an inference.

We further decline to draw an adverse inference from the deletion of computer files on the desktop. This analysis, however, is much simpler. Here, the SEC again failed to show it was

---

[7] The other case relied on by the SEC has similar flaws. In *Oleksy v. General Elec. Co.*, the party claiming spoliation was not requesting an adverse inference but merely submitted a motion to compel. No. 06-cv-1245, 2011 WL 3471016 at *1 (N.D. Ill. Aug. 8, 2011). The motion arose because the party contesting the motion had instituted a litigation hold on some documents, but had neglected to inform its off-site storage facility of the hold. The non-moving party admitted that destroyed documents were discoverable, even explaining the contents of specific documents, and the court did not give weight to their argument that the documents were irrelevant to the litigation. *Id.* at *5.

likely that any relevant documents were deleted.  Even drawing inferences in favor of the SEC, it

has not shown that the deletion was intentional.  Further, the SEC's own brief points out that the

documents that were deleted were more likely to be beneficial to Sanchez.  (*See* Sur-Reply at 5

("[I]t is safe to infer that if Sanchez ever performed any internet-based research of Potash,

CCleaner wiped any resulting digital evidence from the desktop.").)  *See Scalera v. Electrograph*

*Systems, Inc.,* 262 F.R.D. 162, 179 (E.D.N.Y. 2009) (denying adverse inference because "while

Defendants have unquestionably breached a duty to preserve emails in this case, Plaintiff has

ultimately failed to demonstrate that any destroyed emails would have been favorable to her

position").  As there is no evidence of bad faith, an adverse inference is not warranted here

either.

### B.  Insider Trading

As the SEC asserts, it is possible to establish insider trading through circumstantial

evidence.  This is true because you cannot expect a tipper or tippee to voluntarily confess to

passing or receiving non-public information, thus triers of fact will sometimes have to infer that

such action occurred.  *See SEC. v. Roszak*, 495 F. Supp. 2d 875, 887 (N.D. Ill 2007) ("Direct

evidence is rarely available in insider trading cases, since usually the only witnesses to the

exchange are the insider and the alleged tippee, neither of whom are likely to admit to

liability."). The exact amount of circumstantial evidence required to avoid summary judgment is

harder to define.

As a preliminary matter, the SEC asks us to give Sanchez's deposition testimony little or

no weight.  It claims that Sanchez "identified his 'signal, confirmation, intuition' triumvirate

excuse" a year after he first met with the SEC.  The SEC believes that because his story is "too

convenient," we should ignore it.  (Resp. at 18.)  We, however, will not penalize Sanchez for

voluntarily meeting with the SEC when it first opened the investigation.  It is not surprising that

after time to think, and with the advice of a lawyer and a certified, neutral translator, Sanchez

was more clearly able to articulate his explanations.  Even drawing inferences in favor of the

SEC, there is no reason to ignore his testimony.

### I.  Circumstantial Evidence Presented by the SEC

The SEC's circumstantial evidence consists of: (1) the suspicious Potash trades, (2) the

fact that the trades "marked a dramatic departure from Sanchez's trading historically,"

(3) Sanchez's "implausible reasons for such trades," and (4) "Sanchez's bad faith spoliation of

his electronically stored information."  (Resp. at 13.)  As the facts have been laid out in detail

and the spoliation argument was addressed above, we briefly discuss here the SEC's view on the

first three pieces of evidence.

The SEC's first and second point can be summed up by their assertion: "Sanchez's

stunning profits from his Potash trades is [sic] intrinsically suspicious."  (*Id.* at 13.)  Specifically,

the SEC points to the following "suspicious" facts: Sanchez had never before invested in

fertilizer companies; there is no evidence that he recently had invested in any options; the

purchase was relatively large and very risky; he had not previously traded in options using his IB

account, and he had to get authorization to do so; he needed to transfer funds to purchase the 331

options; and finally, the trades resulted in profits of nearly $500,000, or a 1,000% return on his

investment.  To support its argument that these actions are suspicious, the SEC relies on the

testimony of a Chartered Financial Analyst; however, reference to this expert's testimony is not included in the SEC's amended 56.1 Statement and the SEC incorrectly states the expert's findings in its brief. Nonetheless, the expert testified that Sanchez's trades were consistent with the trading of an insider who sought to maximize profits based upon non-public knowledge of the takeover target, the announcement month, and the takeover bid. (Pl. 56.1 Stat. Ex. E.)

The SEC's third area of circumstantial evidence is Sanchez's allegedly incredible explanations. The SEC makes a few speculative points. First, that there is no obvious connection between Sanchez and Potash. (Resp. at 15.) We do not find this relevant because most traders do not have a connection to the companies in which they invest. Second, the SEC finds it hard to believe that anyone would invest large sums of money without printing research. (*Id*. at 16.) This is extremely speculative and does not give rise to a fact that would preclude summary judgment.

The SEC does, however, raise significant questions about the likeliness of Sanchez's explanations. It disputes Sanchez's reliance on the articles he brought to his August 2010 interview. As the articles were published after Sanchez's trading started, we agree that they could not have informed his decision. Further, the SEC asserts that publicly available information could not have lead Sanchez to a decision to purchase the September 125 Potash Call options. Specifically, it argues, that the analyst reports predicted a steady gain over 12 months, not a dramatic spike in only five weeks, and that, assuming an efficient market,[8] the

---

[8] We agree with Sanchez that this is not the appropriate forum to debate the accuracy of the efficient market hypothesis; the general idea behind it being that the stock market incorporates and reflects all relevant information. In theory, if the market were perfectly efficient, an investor would not be able to purchase undervalued stock or sell stocks at an inflated price. Academics and professionals contentiously debate the extent to which the market

reports from May and July would have already been fully reflected in the Potash stock price. (*Id*. at 17.) It also provides three reasons that Sanchez's purported reliance on macro considerations (i.e. the fertilizer industry, the energy sector, agribusiness, rising wheat prices, global population growth) is not credible. First, again assuming an efficient market, those considerations were already reflected in Potash stock, and to the extent that they were not, Sanchez cannot explain why any undervaluation would be corrected in five weeks. Second, "big picture" considerations should lead to purchasing a more diversified portfolio, not one specific stock, and particularly not a soon-expiring call option on one stock. Third, the Potash trade is inconsistent with Sanchez's depiction of himself as a careful, methodical investor. (*Id*. at 18.) Finally, the SEC asserts that, in contradiction to Sanchez's testimony, the market on August 10 was not a "peaceful market." (*Id*. at 19; Pl. 56.1 Stat. Ex. C-1 at 94–95; Pl. 56.1 Stat. Ex. D-13 (the S&P index declined as follows: Aug. 10: 0.62%, Aug. 11: 2.85%, Aug 12: 0.46%, Aug 13: 0.46%).)

### ii. Sufficiency of Circumstantial Evidence

A brief review of the facts in the cases cited by the SEC shows that the circumstantial evidence submitted in this case is not sufficient. The SEC cites three cases for the preposition that "courts uniformly hold that the SEC can establish insider trading through purely circumstantial evidence": *SEC v. Steffes*, --- F.Supp. 2d ---, No. 10-cv-6266, 2011 WL 3418305 (N.D. Ill. Aug. 3, 2011), *Rosak,* 495 F. Supp. 2d 875*,* and *SEC v. Van Wagner*, No. 97-c-6826, 1999 WL 691836 (N.D. Ill. Aug. 25, 1999). (Resp. at 11–12.) We briefly summarize each case

---

fully reflects public information, and indeed, whole industries are built around perceived inefficiencies in the market.

below and find that the SEC has not brought forth evidence equal in weight to the evidence alleged in any of these cases.

In *Steffes*, the SEC survived a motion to dismiss by alleging that some defendants were employees of the company whose stocks were traded and others were in contact with these employees very soon before purchasing the company's securities. The SEC also alleged that the trades were unusual for all of the defendants, sometimes representing more than their annual income and nearly all of their liquid net worth. Based on these and other allegations, the court explained: "Here, the SEC identifies what material non-public information [defendant] is alleged to have possessed . . ., when he possessed this information . . ., and how he obtained sufficient underlying facts to reach that conclusion." *Steffes*, 2011 WL 3418305 at *7. In the current case, at a later stage in litigation, the SEC has not been able to bring forth similar evidence.

In *Roszak*, the court explained "the circumstantial and undisputed evidence is that Defendant Roszak had access to insider information from Filipowski about the proposed merger. . . . Shortly after his contact with Filipowski, he made a large purchase of Blue Rhino stock." *Roszak*, 495 F. Supp. 2d at 887. Additionally, the defendant in *Roszak* contacted four people after speaking with the insider, all four of whom then quickly made substantial purchases in the same stock. *Id.* In *Van Wagner*, the defendant was accused of insider trading in the stock of company for which he sat as chairman of the board of directors. 1999 WL 691836 at *1. While the defendant argued that he was not present on the second day of a two-day meeting—the day on which material, non-public information was discussed—the court denied summary judgment, holding that a jury could infer, as chairman, he was informed of details discussed on the second day. *Id.* at *2. The evidence produced in both of these cases allowed a jury to reasonably infer

that the defendants received inside information from an identified source. Without relying on impermissible speculation, the evidence in this case does not allow a jury to make the same inference.[9]

In fact, we find that the SEC has brought forth less circumstantial evidence in this case than it did in a case for which the Northern District of Illinois granted summary judgment for defendant in 2010. In *SEC v. Horn*, No. 10-cv-955, 2010 WL 5370988 (N.D. Ill. Dec. 16, 2010), the SEC alleged that Dr. Horn, a doctor who performed laser-vision-correction services at LCAV facilities, traded in LCAV stock and options on the basis of nonpublic information. *Id.* at *1. The SEC specifically alleged that Dr. Horn reviewed the company's EBL reports in order to gather the nonpublic information (i.e. the company's percentage behind or ahead of quarterly targets for surgeries and revenue); however it could not determine which specific reports contained the nonpublic information that allegedly served as the basis for his trades, which computer he used to access those reports, or on which date he obtained or possessed the nonpublic information. *Id.* In other words, "There [was] no direct evidence that prove[d] Dr. Horn accessed a computer on a particular day or viewed an EBL report on a date certain." *Id.* The SEC did, however, have evidence that Dr. Horn used LCAV computers and the EBL reports were posted in two of the offices where he worked. *Id.* at *2. The SEC also argued that Dr. Horn's inconsistent deposition testimony provided the necessary circumstantial evidence to

---

[9] The other cases relied on by the SEC are similarly unpersuasive. *See SEC v. Hollier*, No. 09-cv-0928, 2011 WL 201451 (W.D. La. Jan. 18, 2011) ("Contrary to defendants' contentions, the SEC has offered direct evidence connecting Dupuis to Hollier[, an insider,] as well as sufficient circumstantial evidence to allow this case to proceed to trial."); *SEC v. Bluestone*, No. 90-cv-72525, 1991 WL 83960 (E.D. Mich. Jan. 24, 1991) (finding that summary judgment cannot be based on insiders' assertion that they did not know defendant).

support its claims, but the court found, "[e]ven when all inferences are construed in the SEC's favor, any conflict in Dr. Horn's testimony regarding his patterns do not constitute sufficient circumstantial evidence that he was actually getting information from nonpublic sources." *Id.* at *7. The court explained that the SEC's theory rested on the success of Dr. Horn's trades (he allegedly profited by approximately $870,000) combined with his ability to access the reports. *Id.* at *1–2. Explaining, "it is not enough for the SEC simply to identify suspicious trading and ask a jury to infer that it was the product of insider trading," the court granted summary judgment stating, "no jury could find that Dr. Horn ever possessed material, nonpublic LCAV information without engaging in speculation." *Id.* at *5–8.

Here, the SEC makes a few attempts to distinguish this case from *Horn*. First, it states that Sanchez purportedly traded on information about one specific event—the unsolicited tender offer—while Dr. Horn allegedly traded on unidentified information and reports. (Resp. at 11–12.) This distinction is without merit because just as the SEC in *Horn* could not identify which reports Dr. Horn used to inform his trade, the SEC here cannot identify any actual information on which Sanchez relied. Moreover, the issue of materiality is not at issue in either case. Second, the SEC argues that Dr. Horn's story was more credible because he owned LCAV options as part of his compensation; conversely, Sanchez had no connection to Potash. (*Id.* at 14–15.) As mentioned above, we do not find the lack of personal connection relevant because most traders do not have a connection to the companies in which they invest. Finally, it insists that Dr. Horn had two credible reasons for his trading activity—it served to hedge against a potential loss in options he already owned and it sought to exploit a pattern he had noticed in the stock's historical price movements—while Sanchez's explanations "lack credibility and are

29

unsupported by the evidence." *See* discussion *supra* IV(b)(I). While we cannot address credibility on a motion for summary judgment, it is not necessary to do so, because even if Sanchez's explanations are not as credible as the ones provided by Dr. Horn, we are still left with a mere suspicion of insider trading. While Dr. Horn clearly could have accessed material nonpublic information, the SEC has not shown that Sanchez ever had an opportunity to acquire nonpublic information. Just as in *Horn*, the SEC theorizes that Sanchez was informed of some unidentified information related to the proposed acquisition, at an unidentified time, by an unidentified insider, and traded on this unidentified information. *See Horn*, 2010 WL 5370988 at *7. And just like in *Horn*, "this chain of speculation does not raise a material issue of fact for consideration by a jury." *Id.*

## V. CONCLUSION

For the reasons stated above, we grant Sanchez's motion for summary judgment. As such, we order that the asset freeze and injunction in place on Sanchez's assets (initially issued August 20, 2010 (Dkt. No. 10)) be released. It is so ordered.

_____
Honorable Marvin E. Aspen
U.S. District Court Judge

Dated: December 28, 2011